606 F.2d 689
 102 L.R.R.M. (BNA) 2537, 87 Lab.Cas. P 11,592
 The OAKLAND PRESS COMPANY, a Subsidiary of Capital Cities
Communications, Inc., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Newspaper Drivers & Handlers' Local No. 372, etc., Intervenor.
 No. 77-1320.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 8, 1979.
Decided Oct. 4, 1979.
 
 L. Michael Zinser, King & Ballow, Nashville, Tenn., for petitioner.
 Elliott Moore, Anton Hazzar, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., Bernard Gottfried, Director, Region 7, N. L. R. B., Detroit, Mich., for respondent.
 Before LIVELY, Circuit Judge, CECIL, Senior Circuit Judge, and BROWN, District Judge.*
 CECIL, Senior Circuit Judge.
 
 
 1
 The Oakland Press Co., (Oakland), a subsidiary of Capital Communications, Inc., Petitioner, engaged in the business of publishing and printing a newspaper of general circulation, petitions this Court to review an order of the National Labor Relations Board (Board), Respondent, finding that Oakland had violated Section 8(a)(5) of the National Labor Relations Act (29 U.S.C. Sec. 151 et seq.) by refusing to bargain with the Union for new contracts. The Board cross petitions for enforcement of its order.
 
 
 2
 Two units of employees of Oakland, all Circulation Department Truck Drivers and City Dealer Drivers, hereafter Truck Drivers, together with all Circulation Department District Managers, hereafter District Managers, constitute the bargaining units involved in the action. The Labor Organization with which Oakland was charged with conducting negotiations is Local 372, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Union).
 
 
 3
 In 1973 Oakland and the Union entered into separate contracts covering the two bargaining units, each of which provided in part as follows:
 
 
 4
 "This Agreement shall be in full force and effect from June 1, 1973 to and including May 31, 1976, and shall continue in full force and effect from year to the year thereafter, unless written notice of desire to cancel or to terminate is served by either party upon the other at least sixty (60) days prior to the date of expiration."
 
 
 5
 On March 15, 1976, Elton L. Schade, Secretary-Treasurer of the Union, wrote identical letters to Oakland which stated in part:
 
 
 6
 "You are hereby notified that Newspaper Drivers and Handlers Local 372, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, desires to continue its current collective bargaining agreement with your firm, but also to negotiate certain changes or revisions in its provisions, including those set forth in memorandum agreements and other supplements thereto to take effect during the contract period commencing June 1, 1976.
 
 
 7
 "Local 372 offers to meet and confer with your representatives for the purpose of negotiating said changes or revisions at a mutually convenient date, time or place.
 
 
 8
 "The changes or revisions to be negotiated will be sent to you at a later date."
 
 
 9
 Robert Ballow, labor counsel for Oakland, received this letter some time after April first. He concluded that the Union had not followed the language of the termination clauses and, therefore, the contracts would automatically be renewed for a period of one year and were not now negotiable. The Administrative Law Judge made a finding of fact and concluded that the language of the letters was technically sufficient for a termination of the contracts in question and that they were subject to negotiation. The Board affirmed this finding.
 
 
 10
 Thus, we are confronted at the outset with the issue of whether these 1973 contracts were effectively terminated. This issue properly stated for our consideration is:
 
 
 11
 WHETHER SUBSTANTIAL EVIDENCE ON THE RECORD AS A WHOLE SUPPORTS THE BOARD'S FINDING THAT THE COLLECTIVE BARGAINING AGREEMENTS COVERING THE TRUCK DRIVERS AND DISTRICT MANAGERS WERE EFFECTIVELY TERMINATED BY THE UNION, THEREBY REQUIRING PETITIONER TO NEGOTIATE WITH THE UNION FOR NEW AGREEMENTS CONCERNING ANY ISSUES COVERED BY THE AGREEMENTS INVOLVED.
 
 
 12
 It is provided in 29 U.S.C., Sec. 160(f) that
 
 
 13
 " * * * the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall * * * be conclusive." See also Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951).
 
 
 14
 We summarize the evidence before the Administrative Law Judge:
 
 
 15
 Counsel for the petitioner argues that since the letters of the Union did not specifically use the words "cancel" or "terminate" they did not comply with the language of the contracts for termination. In addition, he argues that the Union's letters unambiguously assert its desire to continue the agreements in force and negotiate only certain provisions of them. This, counsel claims, was the intention of the Union for the reason that there were provisions of the agreements which they did not want to open up to renegotiation, such as dues checkoff and picket line protecting clauses.
 
 
 16
 On one occasion, counsel for petitioner asked Schade, counsel for the Union, if he intended his letters of March 15, 1976 to terminate the contracts and he responded that he did not.
 
 
 17
 The Administrative Law Judge relies largely for the basis of his finding on the history of the negotiations between the parties.
 
 
 18
 The first collective bargaining agreement between these parties was entered into in 1972, effective through May 31, 1973. Like the agreements now before us, it provided for automatic renewal "unless written notice of desire to cancel or terminate (was) served by either party upon the other at least sixty (60) days prior to the date of termination." On March 8 and 9, 1973, the Union informed the petitioner that it desired
 
 
 19
 " * * * to continue its current collective bargaining agreement with your firm, but also to negotiate certain changes or revisions in its provisions, including those set forth in schedules, memorandum agreements thereto, to take effect during the contract period commencing June 1, 1973."
 
 
 20
 The language of this letter is virtually identical to language of the Union letters in the case now before us. It was considered to terminate the agreement of 1972. The Law Judge considered that if that language terminated the contracts then, it was sufficient to terminate them now. The parties negotiated the collective bargaining agreements, now before us, on August 17, 1973, to be effective June 1, 1973 to May 31, 1976.
 
 
 21
 The record indicates that the parties arranged negotiating sessions and, in fact, met on several occasions in April, May and June 1976. At the hearing before the Administrative Law Judge, Robert Ballow, petitioner's counsel, testified, in effect, that, although he felt that the contract had not been terminated, he, nevertheless, wanted to allow the Union to construct a record during these sessions. As we said above, Ballow felt that the Union's letters constituted an attempt to negotiate changes in the contract but not terminate the contract.
 
 
 22
 Other evidence considered by the Law Judge consisted of letters of April 11th and 19th from Schade, Secretary-Treasurer of the Union, transmitting the Union's proposals. In each letter it was stated,
 
 
 23
 "Enclosed please find (2) copies of the Union's proposal to amend the current District Managers contract which Expires on May 31, 1976." (Emphasis added)
 
 
 24
 The Law Judge found that the argument of counsel for petitioner
 
 
 25
 " * * * does not take into consideration the past history of bargaining between these parties or other extrinsic evidence which clearly slows (sic) the Union's position and which reasonably puts the Respondent (employer) on notice concerning it."
 
 
 26
 He found further,
 
 
 27
 "The point here is that the past practice was to treat the charging parties' letter as a letter to re-open the contract for negotiation of all substantive terms and absent agreement prior to May 31, the contract would terminate as of that date. However, the Union would consider entering into extension agreements."
 
 
 28
 We conclude that, while the record is susceptible to differing conclusions, " * * * substantial evidence on the record considered as a whole" supports the findings of the Administrative Law Judge which were adopted by the Board.
 
 
 29
 Accordingly, we enforce the order of the Board requiring Oakland to bargain with the Union for a contract with Truck Drivers. By Oakland's refusal to so bargain, it violated Section 8(a)(5) of the National Labor Relations Act.
 
 
 30
 We consider further the issue of whether District Managers were supervisors in the employ of Oakland. The employer claims that the District Managers are supervisors of the paper carriers and, thus, are not an appropriate unit for the negotiation of a collective bargaining agreement.
 
 
 31
 "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. Sec. 152(11)
 
 
 32
 "Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining." 29 U.S.C. Sec. 164(a)
 
 
 33
 The record clearly indicates that the District Managers, working as salaried individuals in the Oakland offices, are responsible for the sale, promotion and delivery of newspapers within a given geographic area. To exercise these responsibilities, the record also clearly indicates that the District Managers have the authority to hire the newspaper carriers, assign them to specific routes, direct them with respect to the manner of delivering and collecting charges for the newspapers, as well as the authority to fire the carriers.
 
 
 34
 The determinative factor with respect to this issue is whether the paper carriers are employees of Oakland or are independent contractors. The definition of employee as contained in the statute is:
 
 
 35
 "The term 'employee' shall include any employee * * * unless this subchapter explicitly states otherwise, * * * but shall not include * * * any individual having the status of an independent contractor, or any individual employed as a supervisor * * * " 29 U.S.C. Sec. 152(3)
 
 
 36
 The Administrative Law Judge found, and the record indicates that,
 
 
 37
 " * * * most of the 1,250 paper carriers are children of approximately 12 years of age who have rather small routes and who deliver the newspaper on their skateboards, bicycles, by walking or on horseback. (There are about 35 motor routes handled by adults.) They typically have about 50 subscribers on their routes and typically make about $2.00 a day from this work 4 cents per paper. (The motor carriers have 175-200 subscribers and are paid 6 cents per paper, 2 cents of which is to cover automobile expenses. Thus the adults make $7 to $8 per day, plus expenses.) They do not own their routes and indeed if they fail to deliver their papers or appropriately collect for them, they are summarily terminated.
 
 
 38
 "The evidence also shows that typically these young people maintain their routes for a period of 6 months to a year. (The adults tend to keep their routes somewhat longer.)
 
 
 39
 Admittedly, these paper carriers are under the direction and control of the District Managers. However, the Administrative Law Judge, considering the evidence as he viewed it, concluded that,
 
 
 40
 " * * * the District Managers are employees within the meaning of Section 2(3) of the Act and are not supervisors in that they do not exercise supervisory control over other employees of the employer."
 
 
 41
 Accordingly, he found that they were an appropriate unit for the purpose of collective bargaining within the meaning of Section 9(b) of the Act.
 
 
 42
 In so ruling, the Administrative Law Judge specifically refrained from deciding whether the paper carriers were actually independent contractors. Though he noted that the argument of the parties had been directed "to the question of whether or not (the paper carriers) are independent contractors," the Judge stated in his decision "that is not the real issue. The real issue is whether these individuals are employees." The Judge stated that he did not reach the question of whether the paper boys were independent contractors. With respect to this issue, the judge ruled that "as a matter of policy" the carriers should not be treated as employees.
 
 
 43
 The Board adopted the findings and conclusions of the Administrative Law Judge as its own.
 
 
 44
 We cannot accept the finding that, as a matter of policy, they are not employees. Whose policy? They are entitled to be definitely classified under the statute. Either they are legally employees or, according to law, they are not employees.
 
 
 45
 We remand the case to the Board for determination of the legal status of these paper boys with reference to their employment relationship to Oakland.
 
 
 
 *
 The Honorable Bailey Brown, Chief Judge, United States District Court for the Western District of Tennessee, sitting by designation